IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**TREVA KIRKBRIDE,**

        **Plaintiff,**

                                        **Case No. 2:23-cv-3212**

        **v.**                                **Magistrate Judge Elizabeth P. Deavers**

**ANTERO RESOURCES CORPORATION,**

        **Defendant.**

## OPINION AND ORDER

This matter is before the Court on Plaintiff Treva Kirkbride's Motion for Class Certification. (ECF No. 59.)  Defendant Antero Resources Corporation ("Antero") filed a Response and Plaintiff filed a Reply.  (ECF Nos. 64, 67.)  For the reasons that follow, the Court **DENIES** Plaintiff's Motion.

## I. Background

On September 29, 2023, Plaintiff filed this case as a putative class action, asserting a single breach of contract claim against Antero.  (ECF No. 1.)  On May 17, 2024, Plaintiff filed a First Amended Class Action Complaint and on November 19, 2024, Plaintiff filed a Second Amended Class Action Complaint ("SAC").  (ECF Nos. 37, 45.)  The SAC alleges that Antero systematically underpaid royalties owed to Plaintiff and other putative class members. According to Plaintiff, each putative class member receives royalties from Antero's natural gas production pursuant to an oil and gas lease containing a Cost Free Royalty provision.  In Plaintiff's lease, the Cost Free Royalty provision states:

> Cost Free Royalty: It is agreed between the Lessor and the Lessee that, notwithstanding any language herein to the contrary, all royalties for oil, gas, or

> other production accruing to the Lessor under this Lease shall be paid without deduction, directly or indirectly, for the costs or expenses of Lessee relating to producing, gathering, storing, separating, treating, dehydrating, compressing, processing, transporting, and marketing the oil, gas and other products produced hereunder.

(ECF No. 45 at ¶ 7.)  As relevant here, Plaintiff alleges that:

> Antero, in its calculation and payment of royalties to Kirkbride and the other members of the Class, has consistently breached its obligations to the members of the Class under the Cost Free Royalty provision of the Class Leases by directly or indirectly deducting, from the selling price of natural gas and natural gas liquid products, various post-production costs that are specifically prohibited under the Class Leases, including gathering, storing, separating, treating, dehydrating, compressing, processing, transporting, and marketing the gas and other products produced thereunder.  As a result, Antero has consistently underpaid the royalties owed to Kirkbride and the other Class members.

(*Id*. at ¶ 17.)  Plaintiff's class allegations assert, in part, that:

> There are questions of law or fact common to the Class, including:
>
> > a.  Whether Antero has breached its obligations under the Class Leases by deducting various post-production costs from the sales price of residue gas and natural gas liquid products in its calculation and payment of royalties to Kirkbride and other Class members.

(*Id.* at ¶ 26.)

In moving for class certification, Plaintiff explains that, through discovery Antero produced 86 oil and gas leases, each containing a Cost Free Royalty provision "identical or nearly identical" to the above provision.  (ECF No. 59 at 5.)  According to Plaintiff, the parties have identified 149 putative class members who have received royalties on the production of natural gas from wells drilled subject to these leases.  (*Id*. at 6.)  In Plaintiff's view, class certification is proper for two reasons.  First, the Cost Free Royalty provision, appearing in each putative class lease, is the "controlling contractual obligation."  (*Id*. at 8.)  Second, Antero employs a uniform royalty payment methodology which results in its choice of payment divorced from its contractual obligations.

Antero contends that Plaintiff's current Motion seeking class certification is based on false premises:  (1) that everyone in the putative class shares a common lease form and (2) that Antero pays those owners the same way pursuant to that form.  According to Antero, the putative class entails several different lease forms with different operative royalty provisions and Antero pays royalties under those lease provisions differently.  As Antero explains, Plaintiff's limited focus on the Cost Free Royalty provision in the putative class leases ignores the existence of the Royalty provision in those same leases, and the two provisions must be read in conjunction. With respect to Plaintiff's lease, the Royalty provision requires:

> Royalty. In consideration of the premises, the said parties covenant and agree as follows: Lessee shall deliver to the credit of Lessor, in tanks or pipelines, free of all costs and expenses except taxes applicable thereto, a royalty of fifteen percent (15%) of the oil produced. Lessor shall receive on a monthly basis, as a royalty, fifteen percent (15%) of the proceeds realized at the well from the sale of all gas marketed from the premises. Lessee shall have the option to make such payments on a quarterly basis if such monthly net royalty proceeds are less than $100.

(ECF No. 45 at ⁋ 7.)  As Antero describes, however, half of the putative class members do not have this same operative Royalty provision.  In fact, Antero asserts, the various Royalty provisions vary materially among the putative class leases.  Thus, Antero claims that the material differences in the various lease royalty provisions are fatal to certification.

## II. Legal Standard

The class action is a unique mechanism in civil litigation.  It represents "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (quotation omitted).  Nevertheless, "a district court enjoys broad discretion to decide whether class certification is appropriate." *In Re Ford Motor Co.*, 86 F.4th 723, 727 (6th Cir. 2023) (citing *Sandusky Wellness Ctr., LLC v. ASD Specialty Healthcare, Inc.*, 863 F.3d 460, 466 (6th Cir. 2017)).  To justify a departure from the

named-parties-only rule, though, a putative class representative must make certain showings. Under Federal Rule of Civil Procedure 23(a), the named plaintiff(s) must show that: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.  Fed. R. Civ. P. 23(a).  These requirements limit abuse of the class action mechanism by ensuring, among other things, that the class claims are "fairly encompassed by the named plaintiff's claims." *Wal-Mart*, 564 U.S. at 349 (quotation omitted).

Beyond satisfying Rule 23(a), the putative class must also comply with one of the provisions of Rule 23(b).  Here, Plaintiff seeks certification under Rule 23(b)(3).

Under Rule 23(b)(3), the Court must "find[ ] that the questions of law or fact common to class members predominate over any questions affecting only individual members."  This "predominance" inquiry is similar to, though "more stringent" than, Rule 23(a)(2)'s "commonality" requirement, with the former (*i.e.,* predominance) said to "subsume[ ]" or "supersede[ ]" the latter (*i.e.*, commonality).  *Cooper v. NeilMed Pharms., Inc.,* 342 F.R.D. 240, 243 (S.D. Ohio 2022) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 609 (1997).  That is, "Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a)['s commonality requirement]." *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013) (citing *Amchem*, 521 U.S. at 623–24).  Further, the court must find that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  This "superiority" requirement aims to "achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without

4

sacrificing procedural fairness or bringing about other undesirable results." *Amchem*, 521 U.S. at 615 (quotation omitted).

### III. Analysis

Plaintiff seeks to represent a class defined as:

All persons to whom Antero has paid royalties at any time since September 29, 2019, under oil and gas lease agreements or overriding royalty agreements covering lands located in the State of Ohio, under which Antero owns, or has owned, the lessee's interest under leases which contain a "Cost Free Royalty" provision, which generally requires:

…all royalties for oil, gas, or other production accruing to the Lessor under this Lease shall be paid without deduction, directly or indirectly, for the costs or expenses of Lessee relating to producing, gathering, storing, separating, treating, dehydrating, compressing, processing, transporting, and marketing the oil, gas, and other products produced hereunder (hereinafter, "Class Leases").

Excluded from the Class are: (1) agencies of the United States of America; and (2) Antero, its current officers and employees.

(ECF No. 45 at ⁋ 13.)

Plaintiff contends she has satisfied the six requirements for class certification under Rule 23(a) and Rule 23(b)(3). In responding, Antero appears to collapse Rule 23(a)'s commonality requirement and Rule 23(b)(3)'s predominance requirement into one issue, arguing that Plaintiff cannot show that common issues predominate. Beyond that, Antero contends that Plaintiff's claims are not typical of the class, Plaintiff is not an adequate class representative, and Plaintiff's class definition is overbroad and cannot be remedied through narrowing. Because the commonality/predominance issues are dispositive, the Court confines is analysis to those issues.

"Rule 23(a)(2) requires that for certification there must be 'questions of law or fact common to the class.'" *In re Am. Med. Sys., Inc.,* 75 F.3d 1069. 1080 (6th Cir. 1996). The claims must depend on a common contention "of such a nature that it is capable of class-wide

5

resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart* 564 U.S. 338, 350 (2011).  The inquiry focuses on whether a class action will generate common answers that are likely to drive resolution of the lawsuit, not on whether common questions are raised.  *Id.*

Predominance under Rule 23(b)(3) requires the Court to evaluate whether the "common questions 'predominate over any questions affecting only individual members.'" *Speerly v. Gen. Motors, LLC*, 143 F.4th 306, 317 (6th Cir. 2025) (quoting Fed. R. Civ. P. 23(b)(3)).  To do so, "[t]he court must 'put the common issues on one side, the individual issues on the other, then qualitatively evaluate which side predominates.'" *Id.* (quoting *In re Nissan N. Am., Inc. Litig.,* 122 F.4th 239, 252 (6th Cir. 2024); *see also Fox v. Saginaw Cnty.*, 67 F.4th 284, 300 (6th Cir. 2023) (citing *Martin v. Behr Dayton Thermal Prods. LLC*, 896 F.3d 405, 413 (6th Cir. 2018)) (noting that the court must "add up all the suit's common issues (those that the court can resolve in a yes-or-no fashion for the class) and all of its individual issues (those that the court must resolve on an individual-by-individual basis)" and then "qualitatively evaluate which side 'predominates' over the other.")).

"Subdivision (b)(3) parallels subdivision (a)(2) in that both require that common questions exist, but subdivision (b)(3) contains the more stringent requirement that common issues 'predominate' over individual issues." *In re Am. Med. Sys.*, 75 F.3d at 1084 (citation omitted).  That is, "Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a)." *Comcast*, 569 U.S. at 34 (citing *Amchem*, 521 U.S. at 623–624).  "What matters to class certification ... is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Zehentbauer Fam. Land, LP v. Chesapeake Expl., L.L.C.*, 935 F.3d 496, 503 (6th Cir.

2019) (quoting *Wal-Mart*, 654 U.S. at 350 (emphasis and omission in *Wal-Mart*)).  Put another way, "a plaintiff must establish that issues subject to generalized proof and applicable to the class as a whole predominate over those issues that are subject to only individualized proof." *Hicks v. State Farm Fire & Cas. Co.,* 965 F.3d 452, 460 (6th Cir. 2020) (quoting *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 544 (6th Cir. 2012)).

As to commonality, Plaintiff identifies five common questions which she believes will determine the validity of each putative class member's breach of contract claim in one stroke:

1.  Whether the Cost Free royalty provision precludes Antero from deducting post-production costs in the calculation and payment of gas royalties;

2.  Whether the Cost Free royalty provision requires Antero to pay royalties to each of the putative class members based upon the gross prices received on Antero's sales of natural gas liquid purity products;

3.  Whether Antero's practice of deducting post-production costs in the calculation and payment of royalties constitutes a breach of the leases;

4.  Whether Antero's failure to calculate and pay royalties based upon the gross proceeds received by Antero on natural gas liquid purity products constitutes a breach of the Cost Free royalty provision; and

5.  Whether the putative class members are entitled to prejudgment interest as a result of Antero's underpayment of gas royalties owed?

(ECF No. 59 at 14.)

With minimal elaboration, Plaintiff asserts that commonality exists because the first two questions turn on the interpretation of the Cost Free Royalty provision, which is nearly identical across all leases; the second two questions will be resolved by analyzing Antero's uniform royalty accounting methodology; and the final question, entitlement to prejudgment interest, is a derivative issue to be decided once liability is established.  Relatedly, with respect to predominance Plaintiff contends that the predominant question here is whether Antero's common conduct breached the putative class leases.  Relying on her interpretation of

*Zehentbauer,* 935 F.3d 496 and *Grissom v. Antero Res. Corp.*, 2022 WL 3139378 (S.D. Ohio Aug. 6, 2022), Plaintiff argues that liability in this case will turn on whether Antero "'uniformly miscalculated royalty payments in breach of the . . . uniform contracts.'" (ECF No. 59 at 18 quoting *Grissom*.) Beyond this, Plaintiff contends that whether Antero's common royalty payment methodology constitutes a breach of the putative class leases also is a common question of fact because Antero employed the same royalty payment methodology with respect to each putative class member. (*Id.* at 19.)

As noted above, and as abundant caselaw confirms, the number of common questions Plaintiff identifies is not dispositive here. Rather, it is the "'capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation.'" *Wal-Mart*, 564 U.S. at 350 (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof,* 84 N.Y.U.L.Rev. 97, 132 (2009)). Importantly, "dissimilarities within the proposed class are what have the potential to impede the generation of common answers." *Id.* Here, Plaintiff makes two related arguments intended to persuade the Court that fatal dissimilarities within the proposed class do not exist. First, Plaintiff focuses only on the Cost Free Royalty provision contained in all the leases. Second, Plaintiff contends that Antero utilizes a uniform royalty payment methodology that is both untethered from the leases and in breach of them. Both of these arguments fail.

The Court turns first to Plaintiff's argument pertaining to the Cost Free Royalty provision of the putative leases. According to Plaintiff, this provision is "the controlling contractual obligation" because it contains the clause "notwithstanding any language herein to the contrary." (ECF No. 59 at 8.) In Plaintiff's view, the purpose of the "notwithstanding" clause is to supplant

and override any proposed royalty variations, creating a single, common standard for royalty payments.  (ECF No. 67 at 6.)  For several reasons, the Court disagrees.

First, Plaintiff's argument disregards the Royalty provision in each of the putative class leases.  As such, Plaintiff's argument defies fundamental contract interpretation principles. Indeed, as even Plaintiff herself recognizes, under Ohio law, "a contract must be construed in its entirety and in a manner that does not leave any phrase meaningless or surplusage."  *Eastham v. Chesapeake Appalachia, L.L.C.*, 754 F.3d 356, 363 (6th Cir. 2014) (quoting *Local Mktg. Corp. v. Prudential Ins. Co.,* 159 Ohio App.3d 410 (2004)).  The unsoundness of Plaintiff's position here is highlighted by even a quick read of the Royalty and Cost Free Royalty provisions in her own lease.  As Antero aptly explains, the question as it relates to Plaintiff's claim "is whether Antero paid Plaintiff her 15% royalty share of gas based on 'proceeds realized at the well from the sale of all gas marketed from the premises' and complied with the Cost Free paragraph in doing so." (ECF No. 64 at 24.)  This explanation is straightforward and confirms that the Royalty provision is necessary to determine to which calculated royalty the Cost Free Royalty provision may then apply.  That is, the Royalty provision cannot be disregarded in favor of reading the Cost Free Royalty provision in isolation as Plaintiff urges here; it makes no sense as a stand-alone provision.

Moreover, to the extent Plaintiff focuses specifically on the "notwithstanding" clause, she does not explain what provision in the 86 putative class leases conflicts with the Cost Free Royalty provision and is required to be overridden.  All this to say, Plaintiff cannot simply cherry pick the language of the Cost Free Royalty provision and rely on it as the basis for class certification.  The language of the Royalty provisions matters and, by extension, the differences

9

among the language of the Royalty provisions of the various leases, as highlighted by Antero, matter.

On this point, Antero explains that there are 15 distinct permutations of Royalty clauses across the putative class leases.  As noted above, according to Antero, there are 43 leases, exactly half the putative class, that have differing royalty obligations from Plaintiff's lease.  (ECF No. 64 at 20 quoting ECF No. 64-7, Expert Report of Kris L. Terry, "Terry Report" at ¶ 24.)[1]  For example, while Plaintiff's lease provides for calculation of royalty payments based on "proceeds realized at the well for all gas marketed from the premises," other leases provide that royalties will be paid based on "net proceeds realized from the sale of all gas marketed from the premises," while others state that royalties will be paid on the "gross proceeds received by Lessee for all goas and any constituents thereof." (*Id.* quoting Terry Report at ¶¶ 9, 29, 37.) Additionally, five leases contain additional language, such as:  "The royalty set forth in this Lease and this Amendment shall apply to all gas, natural gas liquids . . .  and/or other hydrocarbon products removed or recovered from the Leased Premises." (*Id.* at 14 quoting Terry Report at ¶¶ 40-46.)

Thus, Antero's alleged breach of any lease requires an individualized inquiry into that specific lease.  Such a conclusion is consistent with Ohio law which requires that "[t]he rights and remedies of the parties to an oil or gas lease must be determined by the terms of the written instrument." *Lutz v. Chesapeake Appalachia, L.L.C.,* 148 Ohio St.3d 524, 526 (Ohio 2016) (quotation omitted).  And, as Antero points out, different arguments may be applicable to leases containing different Royalty provisions and the resolution of Plaintiff's claim will not resolve the

---

[1] The Court finds no merit to Plaintiff's objections to Ms. Terry's lease categorization in the context of considering her certification motion.  (ECF No. 67 at 14-15.)

claims of other putative class members.  For example, Plaintiff, whose lease requires royalty payments on "proceeds realized at the well" would be subject to an argument that, under governing Ohio law, Antero has paid her correctly under its wellhead valuation.  (ECF No. 64 at 21.)  But, a putative class member whose lease provided for payment on actual sales would not be subject to such an argument.   Stated another way, "the allegedly common question of 'did [Antero] breach the contract' is not common because there are many different contracts with meaningfully different language. . . .  Because the legal question of whether [Antero] breached depends on the language of the contract – and because the language of the contracts is not uniform – there is no commonality." *Ewalt v. Gatehouse Media Ohio Holdings II, Inc*., No. 2:19-CV-4262, 2024 WL 1270786, at *3 (S.D. Ohio Mar. 26, 2024).

Plaintiff tries to escape this reality in several ways.  First, as noted above, Plaintiff asserts that Antero uses a uniform payment methodology regardless of actual lease language.  This argument relies heavily on the report of Plaintiff's expert, Royce Porter.  (ECF No. 58-6 Expert Report of Royce Porter, "Porter Report," *sealed*.)  Without belaboring it, Plaintiff asserts that the uniform royalty payment methodology requires Antero to make a "decision" to determine how it will pay royalties each month for each well, leading Antero to use either the "NGL Method" or the "Wellhead Method" for payment.  Plaintiff asserts that this decision process, called the "Well Upgrade Analysis" is "untethered from the lease language." (ECF No. 59 at 9.)  The end result, as Plaintiff states it, is consistent underpayment when Antero uses the Wellhead Method but not when Antero uses the NGL method.

Antero does not dispute that it performs the same analysis in each month at the well level.  In fact, Antero explains that it does so to determine whether the net benefit of processing and fractionating the gas into NGL purity products exceeds that gas's value at a downstream

11

sales price.  (ECF No. 64 at 15.)  But, Antero further explains that this analysis does not determine whether it pays royalties on the Wellhead Method (like Plaintiff's royalties) or on the NGL method.  (*Id*. citing ECF No. 64-4, Expert Report of R. David Vinson "Vinson Report" at ¶¶ 14-28.)  Instead, Antero asserts that, following that analysis, it then proceeds to make its royalty payment determinations at the owner and lease level, upon review of each lease and all modifications applicable to each owner's interest.  That is, "when a well goes to revenue, all of those leases that are in that well in that unit on a lease-by-lease and owner-by-owner basis are reviewed.  The information for those owners is input into a sheet that's uploaded into the Enertia system depending on how that lease language reads, and then the system pays based on that interpretation of the lease language."  (ECF No. 58-2 Deposition of Max W. Green "Green Depo." at 171:13-20.)  Thus, all putative class members are not paid in the same manner as Plaintiff or each other under the Royalty provisions of their own leases.   (ECF No. 64 at 18-26 citing Vinson Report, ECF No. 64-4 and Terry Report, ECF No. 64-7.)

According to Antero, it pays Plaintiff and two other owners exclusively on a wellhead valuation; 17 owners exclusively on downstream proceeds (who were never paid like Plaintiff); and 129 owners on both forms of royalty valuation. (Vinson Report at ¶¶ 23- 24.)  Further, within the group of 129 owners, depending on the applicable well and/or lease, some are paid using exclusively a wellhead valuation in one well, using exclusively downstream proceeds in another well, and using a mix of the two in still other wells.  (*Id*. ¶¶ 25-26.)  Beyond that, some owners' royalties were reduced by volume to account for gas not sold, while a small minority received deductions for post-production costs (although Plaintiff did not).  (*Id*. ¶¶ 33-35.)  This means, according to Antero, that not only would Plaintiff's proposed class require individualized assessments of varying lease language, but those individual lease interpretations would have to

12

be applied to the varying ways in which different owners were paid to assess the claim for breach—in some cases, with respect to multiple lease variations and multiple payment methods for a single owner.

Assuming Plaintiff's explanation of Antero's methodology to be accurate, it is only accurate as far as it goes.  Importantly, it stops short of discussing the remaining steps in Antero's royalty payment determinations.  Consideration of these additional steps is critical, however, to determining whether Antero has breached any of the putative class leases.  And, assessing any claim for breach will require an individualized lease-by-lease and owner-by-owner analysis to evaluate the applicable royalty language for each owner, determine what that royalty language requires, and, after that determination has been made, a comparison of what the language requires versus how the owner was ultimately paid under that lease.  As with Plaintiff's argument above, Plaintiff again focuses only on a discrete issue "untethered" from its proper context in attempting to make a showing of commonality or predominance here.

In her Reply, Plaintiff characterizes Antero's explanation as wrongly conflating the calculation of individual damages with the predominance of common questions.  In support, Plaintiff cites *Romeo v. Antero Res. Corp.,* No. 1:17CV88, 2020 WL 1430468 (N.D.W. Va. Mar. 23, 2020), for what she deems an example of a court rejecting the same argument Antero makes here.  *Romeo*, however, is readily distinguishable.  In that case, the court found that Antero had effectively conceded that it uses the same method to calculate its deductions for post-production expenses by stating that the method for calculating the value of the gas at the well and the net value at the factory of the manufactured products, including NGLs, was the same for [the] plaintiffs and all the putative class members. *Id.* at 10.  As that court explained,

> [Antero] describes the "method," not methods, and states that it is "the same" for the named plaintiffs and putative class members. Id. Antero's subsequent

13

> qualification demonstrates only that, while it uses the same method to calculate deductions for post-production expenses, "the calculation itself is individualized and does not yield the same results for each Plaintiff or Mutschelknaus/Matthey Putative Class Member because there are a number of variables integral to the methodology that make each calculation unique." Id. at 7-8. In other words, although Antero employs the same method to calculate its deductions, that method produces different results (i.e., damages).

Id.   Here, however, Antero makes no such concessions.  Indeed, Antero explains in detail how, at the lease level, it does not use the same methods of calculation across all the putative class leases; its method of calculation is dependent upon the specific language of any given lease. Thus, fundamentally, the issue here, based on Plaintiff's allegations, is not one of individual damages calculations but one of individualized breach determinations.   Stated another way "an adjudication in favor of [Plaintiff], on the language of her lease … would merely set the stage for class member-by-class member determinations as to which class members should also be permitted to recover, on the basis of their facts." Foster v. Merit Energy Co., 282 F.R.D. 541, 560 (W.D. Okla. 2012).  Plaintiff's efforts to avoid this outcome by distracting from the individualized facts central to the required analysis are to no avail.

In sum, the Court concludes that, based on the record presented, individualized factual determinations about whether Antero breached its contract(s) with a putative class member depends upon the language of the specific lease with that member is the likely "driver" of this litigation.  Accordingly, Plaintiff has failed to establish commonality under Rule 23(a) or predominance of common questions under Rule 23(b).

### IV. Conclusion

Based on the foregoing, the Court **DENIES** Plaintiffs' Motion for Class Certification (ECF No. 59).

**IT IS SO ORDERED.**


Date: March 6, 2026

      /s/ *Elizabeth A. Preston Deavers*
ELIZABETH A. PRESTON DEAVERS
UNITED STATES MAGISTRATE JUDGE